3230426 Louis Rodriguez Appellant v. The Mildred Antonacci 2016 Living Trust et al. Appelese. Thank you. Good morning and welcome. Mr. Ames, are you ready to start? You may begin. Thank you. May it please the court, good morning. My name is Brent Ames. I represent the appellant, Luis Rodriguez. This is a civil personal injury case arising out of a slip and fall on the exterior of a residential premises in Woodridge. There's essentially two defendants. There's a group of three defendants, which we collectively refer to as the Antonacci defendants. They're the homeowners. A complaint in premises liability has been filed against the homeowners of the property, and then the other defendant is NICOR. That complaint sounds in negligence, and it alleges the conduct of one or more of their agents was a proximate cause in creating the dangerous condition which caused the injury to the plaintiff. So different theories of liability, different legal and factual issues, but in essence the issue on appeal really boils down to approximate cause as to both defendants, specifically whether the trial court erred in granting summary judgment on behalf of both defendants by finding that there was no question of material fact which exists in the records which could support the conclusion that the conduct of either defendant was the proximate cause of the plaintiff's injuries, essentially boiling down to the argument that the theories were too speculative in nature given the facts in the record. Given the applicable standard for summary judgment and the law and the facts of the case, we believe that was an error. We respectfully request that this court reverse and remand for further proceedings. Briefly to get into the background of the facts, the plaintiff was a police officer for the village of Woodridge. He was assigned to perform vacation watch duties for this premises. This is a service offered by the police department for residents of the municipality who are going to be away from their property for an extended period, you know, often on vacation as the name would suggest. And it was needed because the property owner defendants were planning to be away for a period of approximately six months as they had done for several years leading up to the year of the incident. They traveled to Florida for the winter months and so they're part-time residents of Woodridge. They lived there for six months and then they relocate to Florida for the winter. Now, this particular property has what the defendants referred to as their storage area. The pictures sort of speak for themselves. They're laid out in the exhibits throughout the record, particularly pages 555 through 562 as an example of pictures of this so-called storage area. In reality, it's just the side of their house. It's an area which isn't limited by any fencing or gates or signage or anything really. It's just an area of their property on the side of their house between the home and the fence where they decided to store all sorts of materials, debris, you know, things such as old chemicals, plexiglass, of course, which is very relevant to our case, construction materials from prior jobs, gardening tools, etc. After they left for Florida, notably, I should start that the gas meter, which is how NICOR got involved, is located within that storage area. So, after the defendants left for Florida, a police officer from Woodridge came to perform vacation watch services, smelled gas, called NICOR. NICOR came to the premises on about December 7th and performed services on the gas meter within this storage area. Subsequently, a subcontractor of NICOR and alleged agent of NICOR came back on December 17th to this storage area to once again perform some work related to that gas meter. Then on December 29th, the plaintiff, in the course of performing his vacation watch duties, was walking in through the storage area around the perimeter to canvas the area, slipped on a piece of plexiglass, which was covered in snow, then in there in the pathway, fell, suffered catastrophic injuries resulting in multiple surgeries and the inability to return to work as a police officer. Turning to the case against the homeowner, sounding in premises liability. Axiomatic property owners have a duty to exercise ordinary care in maintaining their premises. If they create or fail to cure a dangerous condition when they knew or should have known of said dangerous condition, they're responsible if they fail to exercise ordinary care when that dangerous condition should have been remedied or discovered. Now at the trial court level and in the briefs, you know, the defendants assert that this dangerous condition really is this piece of plexiglass, the singular piece of plexiglass that fell over the pathway. So to begin with, the real question is what should qualify as the dangerous condition? The plaintiff contends it's more than simply a piece of plexiglass. Rather, the real dangerous condition is the storage area generally. It's undisputed. The storage area generally certainly wasn't a proximate cause of the accident. The storage of all the materials within the storage area, including the plexiglass at issue, their habit of not securing the debris and not securing the materials certainly was a dangerous condition in that it's admitted several times by Andrew Natsunachi during the course of his testimony, he had direct knowledge of the propensity for these materials within his storage area to be blown over in the winter months, indicated, you know, the village of Woodridge is a windy area. This is northern Illinois. Stuff would always get blown around there. And he testified when they would come back from Florida after their stay, he was required typically to go to the storage area and clean up debris and junk, in his words, which had been dispersed and blown all over the place. Interestingly and crucially, notwithstanding that direct knowledge of the propensity of this unsecured debris and material within their storage area to just be blown all over the place, they did nothing to secure it before leaving for Florida in November of 2018. They were asked repeatedly what steps were taken and they indicated, we took the garbage out. There was nobody assigned or tasked with keeping an eye over the property, no neighbors, no security cameras. When asked, well what would happen if some cleanup was required while you guys were away, the answer that was provided was it just wouldn't happen. We'd deal with it when we get back. What we have is the defendants being aware of a dangerous condition in the storage of these materials within their storage area on the property and essentially turning a blind eye to it for a period of six months or more, covering their eyes, covering their ears and just saying not my problem until I return and then trying to escape liability when something that's foreseeable goes wrong. Are there cases that are comparable to this one? You have cases that are comparable to this one, either snowbirds as in this case or just people that leave property for an extended period of time without caretakers on the property. No cases directly related to the snowbird situation. The case we cited in our brief, which is analogous, is the blue case. That's a country club case from the Supreme Court where we had a situation where there were tables and chairs which were proponed to being just blown about and the argument raised by the defendants in blue was like, well nobody ever got hurt, we didn't know that this table was going to blow over, therefore how can we be held responsible for something like this? As the Supreme Court indicated in blue, it didn't matter that the specific incident that happened, which was one of these tables blew over and injured somebody, wasn't foreseeable as long as some damage should have been reasonably foreseen. I believe that's extremely analogous to the case at Bard, not just because the winter months and the wind blowing things around, but the idea is it's irrelevant that the specific table, they didn't know that it would blow over or they hadn't noticed that it was about to blow over or that it never hurt anybody before, similar to the arguments raised by the defendants in this case. All that matters is that generally the consequences which result from the negligence could have been foreseen, the exact particulars of the accident did not need to be foreseen. The key for these premises liability care cases come down to reasonable precaution and circumspension, that's what our Supreme Court cases held. Knowledge of a hazardous condition must be imputed on litigants when the danger of one's own actions would have been apparent if they exercised reasonable precaution and circumspension. There was none exercised in the incident case, knowledge should have been imputed on these defendants under the circumstances with the natural and probable consequence, it should have been easily predictable or at least highly probable as a matter of law. It was error to conclude that there was no negligence on their behalf in their theory of premises liability. Staying on the topic of the homeowners, but also turning to an argument from the NICOR. Much was said about the particular piece of plexiglass and where it was held, where it was stored. There's a statement in the deposition transcript from Andrew Atanachi where he says that piece of plexiglass that was less than an inch thick, I put that behind my shed tucked away safely, where I only stored the one inch thick piece of plexiglass behind my meter. Did both defendants try to latch on to that statement to say, well, you know, regardless of anything else, how can it be said that any proximate cause of anything that we did when this was tucked on behind the meter? But that testimony was contradicted by Andrew Atanachi later within the same deposition transcript. After testifying that that was safely tucked behind the meter, he admitted he could not say with any certainty where the plexiglass was stored within the storage area prior to leaving Florida in November of 2018. In addition, when confronted with a photograph, which demonstrated two kinds of plexiglass stored behind his meter, one being over an inch thick, the other being consistent with the substance that injured the plaintiff, he indicated that's it, that's where I always kept my plexiglass, that represents where I stored it, that's where I left it. So more so than him creating a genuine question of material fact as to where he stored it, in the same deposition, albeit contradictory testimony from earlier, he confirmed when confronted with photographic testimony, yep, that's where I put it, I kept it behind the meter. At a minimum, it creates a question of material fact as to whether he stored that behind the meter and defendants, NICOR nor the homeowner, should not be able to attempt to escape liability by arguing that everything was tucked away safely and securely behind that shed. With regard to NICOR, its axiomatic circumstantial evidence is sufficient to survive a motion for summary judgment and win a case on its merits at trial. Direct evidence and slip and fall cases, as our appellate court has confirmed, often impossible to obtain and sometimes circumstantial evidence will be all that exists. NICOR argues all we have is a possibility and that's not good enough and the trial court agreed. Based upon the chain of events of what happened here leading up to NICOR coming onto the property, we have more than a possibility akin to a neighbor child running onto the premises and moving the plexiglass as the trial court suggested was equally possible. Rather, we have something that is much more probable in nature to eliminate it as merely a possibility. The chain of events of how this happened is we have the testimony and a photograph from the defendant confirming that he stored plexiglass consistent with the type that the then we have an agent of NICOR coming onto the property on December 7th. He did not admit to moving anything, of course. He did not deny moving anything, of course. The fact that he's not denying it is not what we're hanging our hat on, but it is important to note that it certainly doesn't eliminate the possibility or the probability in this case that he did move it because his testimony was, I don't remember moving anything. However, if I did, I would have placed it approximately an arm's length away from the work so I could complete my work and I would not have put it back if I thought that it was dangerous to put back over the meter, which we know NICOR instructs its clients not to do. Precisely in the location based on our photographic evidence of where the offending piece of plexiglass ended up at the time of the plaintiff's injury. Importantly, crucially, we also have the testimony of the grid one employee, who was there approximately 10 days after the NICOR employee, Mario Trambuta. He testified there was no plexiglass behind the meter. So, we're left with a chain of events where we have a homeowner and a property owner testifying, I left plexiglass behind my gas meter. We've got a NICOR employee showing up saying, I don't remember what I did, but if I did do it, here's where I would have moved it. We've got plexiglass ending up consistent with where he would have moved it. And then, we've got testimony from 10 days later that it was no longer stored behind the gas meter. This is circumstantial evidence, of course. We've got no direct evidence that he did move it. He testified he doesn't remember. However, it is of such a nature and so related as to make this conclusion that he moved it or disturbed it, at the very least, more probable as opposed to merely possible. This is good circumstantial evidence and it's important to note, and it's also axiomatic, circumstantial evidence need not exclude all other possible inferences. The trial court grilled plaintiff. Well, can you confirm for me that it wasn't a neighbor kit? Of course, I can't. No more than I can confirm with certainty that it wasn't a magic vulture that flew from the sky, plucked it with its talons and dropped it down the way. Of course, I can't confirm that, but the law says we don't have to. We don't have to exclude every possible inference as long as the case in the conclusion is more probable than merely possible. So, what would be more probable? The chain of events that we've described and that we have confirmed in evidence or a rogue neighbor child who, as a joke, went under their property and moved their plexiglass into the path? What about the wind? So, the wind could certainly have played a role in this and we think that it did. The argument and the allegation is that the moving of the plexiglass and the relocating it by NICOR was a proximate cause in creating the dangerous condition of the unsecured debris. Of course, there can be more than one proximate cause. The proximate cause of NICOR being moving the plexiglass or disturbing it to in such a way where it wasn't as secured and then the windy weather of Woodridge, as the defendants admitted knowledge, moving it down and making it fall into the pathway. I see I'm out of time unless there's questions. Are there any other questions? I do have a few. Mr. Haynes, I'm looking at the photographs right now. You had mentioned a site, 600 and some of the record, but I'm not sure what you were directing us to. Which photograph did you direct us to early on in the argument? I apologize, your honor. I may have misstated. So, they're throughout the record, but they are 555 through 562. It's seven photographs which depict before and after what the storage area looked like. I believe 562 and 561 are Google images taken before the accident and the remaining photographs are what the property looked like after the officer's entry. That was my fault. I thought we started with a six. And then one question too. How is the jury going to solve this murder mystery, so to speak? How are they going to decide whether it was the talent, the child, or the wind? Well, the chain of events creates such a way where the greater the evidence, not just any material fact in the record, but the greater weight of the evidence that supports the logical conclusion based upon the testimony of the property owner, where he stored it, based upon NICOR coming onto the property, confirming where they put it if they would have moved it, and then where it ultimately ended up that it's more probable than not that a NICOR employee relocated it. Now, with regard to the role of the wind, based upon the evidence that we have and the weather of northern Illinois, not just what's obvious to anybody, but what our defendants have testified to, the wind probably certainly did play a factor. There can be more than one proximate cause to an ultimate injury, and it seems clear under these circumstances that both NICOR and the homeowner should be found responsible for their role in each relatively creating approximate cause. Thank you, Mr. Rames. Are there any other questions? I don't have any. Mr. Rames, you will have five minutes at the end of the argument. Mr. Battle? Yes, Justice. May I proceed? You have seven and a half minutes, I understand. Thank you, Your Honor. I'll be as quick as I can. May it please the court. My name is Kenneth Battle, and I'm one of the attorneys that represents the Antonacci defendants, if you will, the homeowners in this particular case. Briefly, I want to go over a couple of points that my opposing counsel mentioned. Essentially, Your Honors, counsel is trying to redefine what the dangerous condition is. They want to make it just this plexiglass standing alone. They want to make it the side of the house that had garbage cans and a couple of rakes and some paint cans. That's not the dangerous condition. As the trial court so aptly put it, dangerous condition was the plexiglass on the pathway where a police officer could be walking underneath snow that was covered that came the night before. The dangerous condition began to exist the night before he fell. Counsel also mentioned what is possible versus what is probable. He has to have it be something that's probable in order to try to attach proximate cause here. We're talking about a situation where, one, the plexiglass somehow was lifted up by a magical gust of wind and landed smack into the pathway. Two, there happened to be a gas leak at this particular residence during the time where people who were the homeowners were not at home. Three, the NICOR and or a third party would come and try to repair that gas leak. Then four, somehow the plexiglass would end up in the pathway. Then five, the snow would fall the night before plaintiff fell. Then six, of course, plaintiff comes, does not see that there is snow covering plexiglass underneath, slips and falls. That is the very definition of impossible. That is not probable. It's not highly probable, nor is it something that would cause liability to attach under the circumstances. Third, I would like to mention that if my co-defendants are seen to have moved the plexiglass to the point in the pathway, as a trial court so aptly put it, I think that's intervening cause that negates any proximate cause on behalf of the Antonucci defendants. And with respect to causation, causation is a big factor here. Plaintiff has admitted over and over again, they don't know what caused this incident. They don't know what caused the plexiglass to be where it ended up in the pathway, which caused the plaintiff to fall. They have no idea whether it was the wind or something else that caused it. Like we talked about a child, a neighbor, another officer who came to the property for a vacation watching the days earlier. We don't know. And it is impermissible for a jury in the state of Illinois to guess. I know you all know this. I'm just stating it for the record. I want to go into a few points I'd like to make for the record. Plaintiff in this particular case failed to provide any evidence at all, any testimony of what caused this condition, what truly caused it. The trial court noted it, and I wanted to just reiterate it for you, for the justices. We don't have a duty as homeowners to protect against a danger that we do not know exists. The timeline here is such that Mr. and Mrs. Antonucci left the property November 1. The initial gas leak notice came on December 7. They came back to service the property on December 17. The snow fell on December 28. Plaintiff fell on December 29. They were unaware of a dangerous condition, i.e. a snow-covered piece of plexiglass on December 28, as they had been long gone from the property for about two months at that time. The plexiglass, notably, this is unrebutted evidence that Mr. Antonucci will testify to, had been in the same place for five years. It hadn't moved. This notion of this debris-filled area where somehow it conveyed constructive or actual notice on homeowners is patently ridiculous in that that piece of plexiglass, that is the brunt of plaintiff's claim that caused the fall, had been in the same spot for five years prior to this incident. There will be no testimony from plaintiff's side that can rebut this. If NICOR, I mean, I'm sorry, going on to another point, I would like to reiterate, it is not the burden of the defendant to figure out how this plexiglass got into the pathway. Plaintiff must present us with some sort of evidence to that effect and how the snow covering it the day before relates to his client falling. It is simply not our burden. We believe that the Magic Chase versus P.T. Feral Construction, we believe that that case is more apropos, and we believe this situation is more analogous to the analysis that's in that one. Liability can't simply be predicated on a guess. We can't be left to speculate. Justice Heddle, I believe you said it aptly, what is a jury to decide? How are they going to figure this out? You know how they'll figure this out is by speculating, is by guessing, and that's just simply impermissible, which is why trial court chose to grant summary judgment in favor of the defendants. We don't believe that there's an issue of material fact here in that regard. Moving on, I'd just like to point out a couple of points, and I'm sorry I'm talking fairly quickly, I just am cognizant of the time. Again, there was no evidence as to what created this sort of hazard condition, and if we don't have that, then we have no duty, nor do we have proximate cause. The last time that the defendant saw the plexiglass, it was up against his house, and where it had been for five years, when he cleaned up the area in question. So now, in much the same way as we had the storms here in our fair county, I think there were tornado watches all over the county for the first time in eons, wind and things may happen on property and so on and so forth. That doesn't necessarily make a dangerous condition. I know the council wants to equate it to such, but that's not the case here. The plexiglass underneath the layer of snow from the day before, that's it in a nutshell. In blue, I'd like to just mention for the court fairly briefly, the court noted in that case that several people had saw those umbrellas flying out of the ground and disturbing the tables and moving the tables. It was a well-known thing at the country club, which is why the court felt like the defendants in that particular case had noticed that those umbrellas may fly up, may disturb those tables, and may hurt those plaintiffs. And that, I submit, is highly distinguishable from our case here in that the plexiglass hadn't moved for five years. Mr. Vallow, what about the plaintiff's claim that Mr. Antonucci testified that he had put both of those pieces of plexiglass behind the meter? Yes, so Mr. Antonucci had testified that there was a piece of plexiglass. There are a couple pieces of plexiglass, as you know. He testified that one of them was in between the house and a shed that stands next to the property, and he testified that there was a piece that was in between the house and the gas meter. Okay. So that's the last time my client saw it. But you keep saying that the piece of plexiglass hadn't moved from its spot for five years. Yes, ma'am. What I'm speaking to, thank you for allowing me to clarify, what I'm speaking to is the piece of plexiglass that plaintiff is complaining about is between the house and the gas meter. There are a couple pieces of plexiglass, so I'm clarifying. It's between the house and the gas meter. That's where he saw it before he left to go to Florida on November 1st. That's where it had been for five years. They used it to cover for windows because birds were flying into their windows, and they didn't have that problem with the birds since 2012 or 13, I want to say. Thank you. Are there any other questions for Mr. Battle? I do, Justice. Mr. Battle, 563 I found in the record. Here's a picture. It's the same as 566. You're probably very familiar with it, but it shows the shot down the walkway and kind of everything that's there. I got a couple questions, and Justice McDade, if you could allow me to ask a few. There appear to be plexiglass, two different pieces of plexiglass in this photo. One I can see hanging out from, it looks like kind of a decorative column in the bottom left of the photo. Are you familiar with that, Mr. Battle? I'm familiar with it, Your Honor. I'm trying to pull it, but I am familiar with it. Okay, I figured you guys looked at these things a million times. Yes, sir. If I was in trial court, I would have him in front of me and ask you to point certain things out, so I'm going to try to do that a little bit. The slip and fall, though, it occurred, I can't tell whether that next item on the pad is the plexiglass, which was the slip, or whether that has been picked up and is against the house. Do you recall? The piece that he fell on shattered. Okay. It shattered underneath him, and you'll see a slippery, it looks like his foot slipped on the snow and the glass, and you'll see the glass shattered underneath. That's probably the second thing that photo in 263, and the first thing, I don't know what it is, whether it's a board, whether it's square in nature, it looks like it has to be something like that. And then my other question to you, as defending the homeowners, was there any testimony in the record that they knew that the police officer would walk down this path to check out the backyard? No, the testimony was actually quite opposite to that. There were no windows or doors on that side of the property. It was simply the little access point or what have you, but there are no windows or doors or point of ingress or egress to the property over there, so they had no knowledge of whether or not the officers would choose to walk down that path. Not that I have any room to make these observations, but it's pretty cluttered if this is a pathway to the back of the house. Would you agree with that? I would agree with that, your honor. It is not intended to be a pathway for ingress or egress for anyone. Is there another way to get to the backyard? Yes, you would have to go around the other side of the house. Thank you. Any other questions? Thank you, Mr. Battle. Thank you, Justices. Mr. Sanchez, you have seven and a half minutes. Good morning. May it please the court, counsel. My name is Brian Sanchez, and I represent the Applee Northern Illinois Gas Company doing business as NICOR Gas Company. We are asking this court to affirm the circuit court's order granting summary judgment to NICOR. Plaintiff's case against NICOR is based on speculation that NICOR moved the plexiglass on which the plaintiff slipped to the location of his fall. It's conceded by everyone that there is no direct evidence of this. The question that is at issue is whether there is circumstantial evidence of this. Briefly on the law, to establish proximate cause, the plaintiff must demonstrate with reasonable certainty that NICOR's alleged negligence caused the plaintiff's injury, and when we're talking about circumstantial evidence, the circumstantial evidence must be of such a nature and so related as to make the conclusion more probable as opposed to merely possible. Now, to get to the facts here, there's no evidence that makes it probable that NICOR moved the plexiglass at issue. Plaintiff concedes this. His opening appellate at page 5 specifically states, quote, it is possible that the plexiglass was tucked behind the gas meter. His reply brief at the top of page 2 specifically states, Mr. Antonacci confirmed that he really does not know where this piece of plexiglass came from. That is NICOR's point. There is no evidence as to exactly where this piece of plexiglass was, and it is complete speculation to say that it was in a place where NICOR had to move it to performance work earlier in the month of December 2018. Plaintiff cites, I actually want to get pretty granular into the testimony that we're talking about, because there are citations to pages C-517 and C-518 of volume 2 of the appellate record for the proposition. This is Mr. Antonacci's testimony, and there were some questions about whether Mr. Antonacci had discarded any plexiglass following the accident, and Mr. Antonacci asked the counsel whether he was referring to a one-inch thick piece of plexiglass, which everybody agrees is not at issue in this case. And then this following exchange occurred, and a question, thank you for clarifying, that's a good point, just so we're clear for our record, I'm referring right now to the piece of plexiglass which we've depicted in photograph 4 of 5 in exhibit 1, which is the plexiglass at issue, and the answer was this. See, that's, no, I don't know where that came from, okay, I really don't, okay, and I never ever left that on the ground, any of that stuff, because I walked back there, okay, and if you put something that's thin and you walk on it, you're going to break it, and I don't want to break it, so I store it up against the house. This testimony highlights the exact point that NICOR is making, that Mr. Antonacci does not know where the plexiglass on which plaintiffs slipped came from. So it says, what page of the deposition were you referring to? I've got 517. Sure, that would be page 37. Thank you, I'll find it from there. Okay, and then there's also some discussion about there being thin plexiglass being stored around the meter based on a photograph that was exhibit 3 to Mr. Antonacci's deposition. That photograph can be found at C564 of volume 2 of the appellate record. Now, the testimony surrounding this photograph does not make it probable that the plexiglass on which plaintiffs slipped was obstructing the meter when NICOR performed its work for the following reasons. First, Mr. Antonacci testified that he does not know where the plexiglass on which 529 of volume 2, which is his deposition, this exchange occurred. Question, before you left for Florida in November 2018, right before the last time you were in that area near the entrance by the garbage cans, did you look for any plexiglass? Answer, no. Question, so it would be fair to say that you cannot tell us as you sit here today where the plexiglass behind the shed was before you left. Answer, yeah. Question, that's correct, right? Answer, yeah. I didn't know where it was. No one has testified that the plexiglass at issue is shown in the photograph attached as exhibit 3 to Mr. Antonacci's deposition, which again is 564 of volume 2. This exchange happened on page 531 of volume 2 of the appellate record. Again, Mr. Antonacci's deposition. Question, let me get the question out for the record. We're looking at deposition exhibit number one, photograph four or five. Again, that is the piece of plexiglass at issue that shattered. Do you know that this, I guess I should say, do you know whether this plexiglass depicted in this photograph is the same plexiglass which we've marked with an X in deposition exhibit number three? Answer, no. Any suggestion by plaintiff's counsel that the photograph at page C564 volume 2 shows the plexiglass at issue is unsupported. Furthermore, there is no foundation in the appellate record as to when the photograph at page C564 volume 2 was taken. No one has testified that this photo depicts the scene before Nyquil performed its work or at any time before plaintiff's accident. This argument about exhibit 3 to Mr. Antonacci's deposition that the plaintiff is making now, I would respectfully submit was not made in the trial court because had it been made in the appellate record, there would be record of when that photograph was taken. It's not in the regarding whether Nyquil moved the plexiglass at issue based on the testimony concerning this photograph at 564 and it were to turn out in the trial court that photograph was actually taken sometime in 2019, months after the accident, then this court will have been seriously misled. There's simply no circumstantial evidence that Nyquil had to move the plexiglass on which of slipped and that is dispositive of this case. Again, just briefly on grid one, for the same reasons that apply to the arguments I just made about Nyquil, there's no evidence that grid one did anything to move any plexiglass and finally, it hasn't been discussed but we've also briefed out in detail why grid one is not an actual agent of Nyquil and I'll rest on the briefs on that matter. Thank you, Mr. Sanchez. Are there any questions for him? I have a few, Justice. Okay. Starting from the end, Mr. Sanchez, the grid one council is working with subcontractors. Obviously, they're doing work to a job with the gas company that entails a long period of time. They're going throughout, I think, the whole state changing these over right now. That's outside the record. That's my knowledge. Is that the only thing they No, and the work that grid one was doing in relation to this meter is they weren't replacing the meter. They were installing what's called an AMI device. That's a fixing that, not replacing. What's that? I said they were fixing the meters. Generally, they were putting the ability to read the meter from a different venue or place, correct? Yes. Yes, that is correct. That is the work that we're doing. No, I do not believe that they are solely contracted with NICOR. Then finally, I don't know if you have the ability to check it. I'm looking at 564 and that's a long shot of the house on volume two of the record. Now, if you go one before that, that's a close up of the pathway. I think you may have been misstating the number in the record. On my appellate record, I have and I'm actually looking at it right now. The Bates number is C564V2 and that is the photo of the meter that has plexiglass on both sides. There's an X on the plexiglass to the left of the meter and a circle on the plexiglass to the right of the meter. That's what I'm looking at right now. I do believe that is the correct Bates stamp is helpful. You said C564V2. That will clear up. I'm looking at C927V2 which is found at page 564 of the record. I will be able to find it. For purposes of the record, all of the citations that I made in my argument are to the Bates stamped pages of the appellate record. That makes sense. Thank you. Are you done? I am finally. Okay. Justice Peterson, any questions? No. Okay. Let's see. We've done Mr. Raines. Yes, thank you. Well, sticking to the topic of the testimony of Mr. Antonacci, which I think we've established was a little bit all over the place. I think it's important to specifically note the Bates stamped C517V2V2 begins on page 30, goes into page 31 and 32 when he reviews the photograph marked as Exhibit 3 of that deposition transcript, was asked the following question and provided the following answer. Question, Andrew, I will briefly show you what we marked as Deposition Exhibit Number 3 and Deposition Number 3 purports. Answer, okay, hold it. Stop. You see where that plexiglass is? Question, I do. Answer, okay, that's where I left it. I won't waste your time reading from the transcript, but he goes on to confirm he's not speaking to just the one-inch thick piece. He's speaking to the thinner piece. The allegation at the trial court was that the one-inch thick piece was all that was left behind the meter along the side of the house and the pieces were tucked behind the shed. This confirms more than just guesswork and him saying I don't know that the thin pieces consistent with what the plaintiff fell upon was located in this testimony according to what I just described behind the gas meter. Putting this directly consistent with what was more probably true was argued in our argument. Now, shifting back to the property owners, Justice Hedl asked with regard to whether the property owners could have expected or knew that the police officer was going to be walking through the storage area. Looks like it would have been difficult. The testimony of Mildred Antonacci, who was the one that requested it, confirmed she gave no specific instructions to the police, never talked to anybody from the police, never told them to stay out of that area, essentially signed up for the vacation watch and left it at that. We've already discussed there was no signage or anything else to confirm that people should stay out of that area or that it was a storage area and it's worth noting it wasn't just Officer Rodriguez who walked through it. In fact, the other officer who initially discovered the gas leak found it for that very reason that he was also canvassing the premises. Officer Rodriguez testified in great detail about what's expected from him as part of these vacation watch duties and it was walking around the perimeter of the home. He was walking around the perimeter of the home not knowing he was walking into some sort of closed storage area. Why? Because it wasn't closed, it wasn't fenced, it wasn't gated. There was no indication it was a storage area aside from a pile of trash. And you know, I think it's also worth noting for an officer investigating signs of crime, it might be pertinent to walk through this area to see why there is debris and trash scattered all over the side of these people's home. The GRID1 employee, Steven Yesel, I would concur with Councilor Sanchez that it is briefed heavily. It's important to note the issue of control. We all know that agency is a factual question and the issue of control is far and away the most crucial detail and factual question for the trier of fact. Brian Carr, who was identified as the individual most knowledgeable with their MSA on behalf of GRID1, testified that according to the MSA, GRID1 was required to perform all work controlled by the defendant. This is marked in the record under 1042 in Volume 2. And also, per the agreement, NICOR controls the manner in which work was performed. That testimony is on page 1040. And they also controlled the pace of the work. That's the testimony directly from GRID1 with regard to the amount of control that NICOR asserted over them, in addition to the other issues, including the fact they were hanging NICOR door tags, holding themselves out as NICOR employees. Clearly, based upon these issues pertaining to control, there should be considered a question of fact as to whether Mr. Yesel was working for them and why is that important? Well, we haven't gotten into it, but Mr. Yesel actually testified that he does remember moving boards and it could have been plexiglass. Once again, he stops just short of admitting that he actually moved plexiglass, but he confirmed when he went to perform his work, it was a mess. He had to move some stuff out of the way. He remembers there being boards and it could have been plexiglass. This seems more direct and circumstantial. Based upon the standard for summary judgment, based upon the claim of premises liability against the homeowners, there certainly seems to be, at a bare minimum, a question of material fact as to whether they either knew or should have known of this dangerous condition on their property. Even if we are to focus solely on this piece of plexiglass that was covered in snow, it should have been enough time based upon that fact alone to have been by a diligent property owner who gave even a minimal amount of care. No care was given. Unless there's any questions, I see I'm out of time. Are there any further questions? I have no questions. Okay, then we thank the three of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible.